DREW, J.
|, Plaintiff, Betty Brown Trichell (“Mrs. Trichell”), appeals from a judgment dismissing her action to reform a 2007 deed of sale of immovable property. We affirm.
FACTS
In 2007, Bill Maza[1] owned a three-bedroom, two-bath home in Columbia, Louisiana, on the Ouachita River. Maza also owned the lot next door, upon which stood a workshop structure connected to the main house by a makeshift walkway.
Mrs. Trichell and her late husband, Ted,[2] were friends with Mr. Maza and negotiated with him to buy the property for $140,000. According to Betty, “He [Bill] told us a hundred and ten for the house and thirty thousand for the building and the lot.” An employee at Betty and Ted’s mortgage company prepared a purchase agreement on July 30, 2007, which provides, in part:
The terms are property located @ 1373 Belle Cote Road, Ouachita Parish, Columbia, LA 71418
Property consists of 2 lots facing river— home is frame construction—3 bedroom 2 bath $110,000. Property has building on lot which is also framed. 1 acre lot + building $30,000. Total $140,000
This document has blanks at the bottom for the name and signature of the seller and purchaser. The blank for the seller is filled in with the handwritten printed (not cursive) name “Billie R Maza.” The blanks for the purchasers are filled in with the handwritten printed (not cursive) names “Ted W Trichell” and “Betty R Brown.” Next to the printed names of the ^[¿purchasers, .Mr. Trichell and Ms. Brown signed the document in cursive writing. However, there is no signature (cursive or otherwise) next to Mr. Maza’s name, and Betty said that he was not present when this document was prepared. Attached to this purchase agreement is a map that shows some 18 lots along the river, including the two lots at issue in this case.
On September 17,2007, Ted Trichell and Betty Brown signed all pages of a pre-printed three-page “Residential Agreement to Purchase and Sell” form that described the property on the first page as:
Property is to be sold and purchased, subject to title and zoning restrictions, servitudes of record, laws and/or ordinances affecting the property, for the sum of Home $110,000 Building lot $30,000 dollars. [$140,000]
On the third page, the document also describes the property in part as:
Includes 1 acre lot with workshop facing river adjoining house—see appraisal
*1258 All three pages of this document bear the handwritten initials “BRM” above the blank labeled “Seller’s Initials,” and the initials are dated 9/17/07. According to the plaintiff, this document was filled out and signed by Betty and Ted, and then “I [Betty] took it to Bill, he read it, said okay, he signed each page, initialed each page.” This document also contains the following clause:
LOAN APPLICATION: ... The Buyer also agrees to provide written proof to the seller of loan pre-approval including verification of credit, employment, & funds to close, by 10/17/2007 (date), or this agreement shall be void-able at the seller’s option.
Attached to this form agreement is another preprinted form with three parts. The top part is captioned “Seller’s Response to Buyer’s Offer.” This portion has a variety of options for the seller to respond to the buyer’s offer, including acceptance, rejection, and counteroffer sections. This part is blank | ¡¡(no option is checked) except for the signature of Billie Ray Maza along with Maza’s phone number and the date, 9/17/07. The center section, “Buyer’s Response to Seller’s Counter Offer,” is blank and unsigned by any party. The third part of the document, “Seller’s Response to Counter Offer,” is blank except for the signature of Billie R. Maza and the date.
The plaintiff explained that Mr. Maza gave Ted and her the legal descriptions of the two lots, and said that she faxed the descriptions to her mortgage company. She offered as evidence a fax cover sheet from October 19, 2007, referring to two attached legal descriptions; the cover sheet indicates that “Exhibit A is coirect” but says “Exhibit B—we are purchasing 1 acre of this property with workshop. Thanks, Betty.” Exhibit B on the following page refers to a 15.65-acre tract fronting the Ouachita River, but there is a sketch next to that legal description that depicts a nearly rectangular lot fronting 61.05 feet on the river. Betty explained that the handwriting was hers and included the information she received about the lots from Mr. Maza. She also testified that during the negotiations, she and Ted walked off the property with the defendant and that the property was bounded by survey stakes that Mr. Maza identified as the boundary markers.
As part of the mortgage process, an appraisal of the property was done, which included photos. The photos included the shop building next to the house and show the walkway between the two structures. Betty admitted she did not see the appraisal until after the closing. Because the property was in a flood zone, a flood elevation certificate was required for the mortgage, and Mr. Maza paid $400 to have that prepared. The comments section indicates, in part, “Single story outbuilding on piles has floor of 77.16 ft.” The photos attached also show the outbuilding.
|4On November 1, 2007, by authentic act, Ted and Betty as buyers and Mr. Maza, by power of attorney to Gloria Cashion[3] as seller, executed a, cash sale deed for the property; the sale price was $145,000. That deed referred to an attached legal description of the property being sold, and this description included only the 0.48 acre-tract that included the main house; it did not mention the property next door or the shop. Likewise, the power of attorney gave Ms. Cashion authority to sell only the same 0.48 acre-tract described in the attached legal description. Betty reported that the first time she saw the documents was at the closing when they were being passed around for signature. She admitted *1259 that she did not read the deed or the power of attorney.
For many years, Betty and Ted occupied all of the property including the lot and the shed next to the house. However, the buyers paid the property taxes on the house only;. Mr. Maza continued to pay the property taxes for the adjacent lot and outbuilding. Betty said that Mr. Maza also stored some things in the outbuilding. She also admitted that Mr. Maza receives mail at 1375 Belle Cote Road, the address adjacent to the main house, and she said that he “probably assigned that as his address.”
Ted died in January 2015. In February, Betty encountered some people parked in front of the property looking for Mr. Maza, and then a few days later, Betty discovered some items missing from the outbuilding. She then called Mr. Maza, who admitted that he had been in the building. When she challenged why he had been there, she said that he told her “you don’t know what you bought, that’s mine.”
|fiMrs. Trichell had a survey done of the lot next door; that survey shows that the lot is 0.3 acres. She testified that later that month, Mr. Maza was conciliatory and offered to reconcile the situation if she would pay the property taxes he had paid, along with part of the water bill. She agreed to pay the taxes but not the water bill. The next day, Mr. Maza told Mrs. Trichell that he had changed his mind and was unwilling to deal with her about the property.
One of Mrs. Trichell’s friends and neighbors, Sheri Piercy, testified as well. Ms. Piercy grew up on Belle Cote Road at a home next to Mr. Maza’s property, and was the prior occupant of the home the Trichells bought in 2006 and 2007, renting it from Mr. Maza. Ms. Piercy testified that Mr. Maza had offered to sell the house and adjacent lot including the shop to the Pier-cys for $140,000. She admitted that she was $10,000 behind on her rent to Mr. Maza when she moved out of the home.
Mr. Maza testified that he never agreed to sell the house and the adjoining lot to the Piercys or the Trichells for $140,000. He explained that his signature on the September 17, 2007, “Residential Agreement to Purchase and Sell” was placed on the document before the “lot and building” description was added. Mr. Maza said that he had agreed to sell the Trichells only the house, not the lot next door. He suggested that the plaintiff wrote in the “lot and building” description after he (Mr. Maza) signed it. He said that he would never have agreed to sell the lot with the shop because that property provided the only right of way to get to the adjoining 15 acres that he owned, and was “functional” to him. Mr. Maza gave his version of what happened when he walked the property with the Trichells:
| fiThe stakes we were looking for were the stakes of the old lot and where the house there on on [sic] 4 acres. Those stakes we was looking for them. His daddy used to own that lot. That’s the lot he bought. He understood what he bought. And we—I never did find those stakes until she got it surveyed here a while back.
Mr. Maza admitted that the electricity for the shop building came from a connection to the main house and that the Tric-hells had been paying the electric bill, but explained that the only electrical equipment on the adjacent lot was a freezer kept in the shop building. He said that he stored woodworking materials in the shop building until he built another shop on other property that he owned, and he also continued to keep lumber under the shop building until the area flooded.
At the end of the plaintiffs case, the defendant moved for a directed verdict,[4] *1260 which the trial judge granted. Among other things, the trial judge expressed that signatures are not mere ornaments: “if it is overturnable simply because you say I didn’t read it and I didn’t inspect it, then it would open up a floodgate for everybody in the world to come in and overturn something simply because they said they didn’t read it.” The trial court concluded by finding that the plaintiff failed to carry her burden of proof. Plaintiff now appeals.
DISCUSSION
On appeal, Mrs. Trichell argues that the trial court erred in rejecting, or refusing to consider, evidence that mutual error led to the transfer- of only the house in the 2007 deed. She argues:
• The district court seemed to believe that Mr. and Mrs. Trichell were negligent in failing to detect the error in the legal description; and
!?• The district court erred by ignoring evidence of mutual error in the 2007 deed.
Mrs. Trichell cites several items of evidence in her favor, including:
• The July 2007 “Agreement to Purchase” plainly states the property to be sold included “2 lots facing river” and separately priced the properties for a total of $140,000.
• The buildings were connected by a walkway shown in photos from both the 2007 appraisal and 2007 flood elevation certificate, both of which included the shop building/lot.
• The electricity for the shop building came from the house.
• The September 17, 2007, “Residential -Agreement, to Purchase and Sell,” initialed by Maza on all three pages, specifies that the property being sold was “Home $110,000 Building 4- Lot $30,000 ... $140,000” and “Includes 1 acre lot with workshop facing river adjoining house—see appraisal.”
• Mrs. Trichell testified -that this agreement represented the deal that she and her late husband made with Mr. Maza.
• Mr. Maza’s “surprising” claim that this agreement had been altered after he signed it.
• Exhibit 3, the “description that Bill had given us for the property, and the lot, the house and the lot.”
• The surveyor stakes on the lots that all parties observed in 2007.
• The Trichells’ undisturbed use of the property for many years prior to Ted Trichell’s death.
• Mr. Maza’s initial admission that he realized that there had been a mistake and agreement, later withdrawn,- to. transfer the adjoining lot/ shop to her if she would pay the taxes and water bill. . . .
• Mr. Maza’s alleged agreement to sell th^ adjoining lot/shop building along with the house to the Piercys for $140,000.
Based upon all of this, Mrs. Trichell argues that the September 17, 2007, agreement represented the actual deal made by the parties and that the legal description attached to the deed, which is far more difficult for a layman to read, does not.
| «The motion for involuntary dismissal is defined by La. C.C.P. art. 1672 B;
*1261 In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the évidence.
This court recently explained the procedure for involuntary dismissal in Town of Arcadia v. Arcadia Chamber of Commerce, 50,564 (La. App. 2 Cir. 4/13/2016), 195 So.3d 23:
A motion for involuntary dismissal requires the trial court to evaluate all the evidence presented by the plaintiff and render a decision based on a preponderance of the evidence.... Proof by a preponderance means that the evidence, taken as a whole, shows that the fact or cause sought to be proved is more probable than not.... The plaintiff opposing a motion for involuntary dismissal is entitled to no special inferences in his favor .... The appellate court will not reverse an involuntary dismissal in the absence of manifest or legal error.
Citations omitted.
In Peironnet v. Matador Resources Co., 2012-2292 (La. 6/28/13), 144 So.3d 791, the Supreme Court discussed, at length, the law of error as it relates to reformation and rescission of contracts. In the course of that discussion, the Court cited a portion of a law review article from Professor Litvinoff, which we repeat here:
When a contract is reduced to writing, an error may occur in the drafting of the instrument so that the written text does not reflect the true intention 'of the parties, When such is the case, upon proof that the error is mutual, that is, that neither party intended the contract to be as reflected in the writing, the court may decree the reformation of the written instrument, rather than the rescission of the contract, so that the writing, once reformed, will express the parties’ true intention.
Ijn the view expressed by Louisiana courts, an action to reform a written instrument is an equitable remedy, and it lies only to correct errors in a written instrument that does not express the true agreement of the parties.
An action to reform a written instrument is a personal action, even when applied to real estate, and the burden of establishing the mutual error by clear and convincing proof rests on the party seeking reformation.
Litvinoff, Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion, 50 La. L. Rev. 1, 45-46 (1989) (footnotes omitted). See also, Matthews v. Duke, 48,887 (La. App. 2 Cir. 5/23/14), 141 So.3d 346, writ denied, 2014-1541 (La. 10/24/14), 151 So.3d 607; M.R. Building Corp. v. Bayou Utilities, Inc., 25,759 (La. App. 2 Cir. 5/4/1994), 637 So.2d 614.
In this case, the plaintiff argues that the parties were in mutual error about the object of the sale, that she was not in unilateral error, and that the deed should be reformed to reflect the parties’ true intent. In M.R. Building, supra, this court explained:
A mutual mistake is a mistake shared by both parties to the instrument at the time of reducing their agreement to writing, and the mistake is mutual if the contract has been written in terms which violate the understanding of both parties; that is, if it appears that both have done what neither intended.
*1262 After a close examination of the testimony and the documentary evidence, we find no error in the trial court’s conclusion that the plaintiff simply failed to carry her burden of proving by clear and convincing evidence that the deed should be reformed due to error. This real estate transaction was handled with less formality than most such transactions, and that lack of formality makes the evidence about the object of the sale equivocal at best. The July 2007 purchase agreement clearly describes the property to be sold as “2 lots facing river” and includes both the house and the shop lot. However, the record does not reflect that Mr. Maza ever saw | inthat agreement; he certainly did not sign it. This is some evidence that the buyers were in unilateral error about the object of the sale, but it provides no evidence that Mr. Maza knew or should have known of the buyers’ belief or error.
What we consider the plaintiffs best evidence is the September 17, 2007, “Residential Agreement to Purchase and Sell,” which stipulates in two different places that the object of the sale was both the house and the shop/lot and which is initialed on all three pages by Mr. Maza. Here, the testimony is directly contradictory; Mrs. Trichell argues that Mr. Maza had the opportunity to read the completed document before initialing it while Mr. Maza argues that the document he initialed did not include the language about the adjacent building and lot. The choice between those two versions is essentially a credibility call, but we again observe that (1) the earlier (July 2007) purchase agreement was evidently never presented to Mr. Maza, and (2) the preprinted “Seller’s Response to Buyer’s Offer” and “Seller’s Response to Counter Offer” were both signed by Mr. Maza on September 17, 2007, with absolutely no information on the rest of that form to indicate the object of the sale, the scope of his acceptance or the price. Finally, we observe that the “Residential Agreement to Purchase and Sell” expired by its terms on October 17, 2007, prior to the closing on the property. This document supplies some evidence that the buyers believed they were buying the house and adjacent loVshop, but given Mr. Maza’s testimony, it does not prove by clear and convincing evidence that he knew or should have known of the buyers’ belief.
Cumulatively, the rest of the evidence supplied simply fails to show either that (1) both parties were in error, or (2) Mr. Maza knew or should In have known that the buyers were in error about the object of the sale. The record reflects that Mr. Maza continued to pay the property taxes on the contested lot after the sale and the trial court was well within its discretion to accept Maza’s testimony that he would not have sold the adjoining lot for the plausible reason that selling the lot would cause him to lose his right of way to- the adjacent property he owned. Sadly, this unfortunate situation could have been avoided with the employment of the usual formality for real estate transactions that clearly defines the scope of what is to be sold. As it stands, the plaintiff simply failed to carry her burden of proving reformation-worthy error by the heightened clear and convincing evidence standard.
DECREE
At appellant’s cost, the judgment below is AFFIRMED.

. Through the record, Mr. Maza’s name appears as Bill, Billy,'and Billie. In the opinion, he will be referenced as Mr. Maza.

. Betty and Ted were unmarried in 2007; her maiden name was Betty Brown.

. Mr. Maza was not present at the closing; Ms. Cashion is his sister.

. Although counsel asked for a directed verdict, this relief is not available in a bench trial. The trial judge properly interpreted it as a motion for involuntary dismissal, La. C.C.P. art. 1672 B.